# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| CRISTI COLLEY and NINA HARRIS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>HONEY BAKED HAM COMPANY, LLC,<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Cristi Colley and Nina Harris ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Honey Baked Ham Company, LLC ("Defendant" or "Honey Baked"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may

1

control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. Honey Baked operates a commercial website, https://www.honeybaked.com (the "Website"), through which users browse and purchase a variety of food products, including hams, turkey, sides, desserts, and gift packages; locate and interact with nearby Honey Baked retail locations; access catering services and product information; create and manage user accounts; and explore seasonal promotions and special offers. Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

By using our website, you consent to us sharing your information with third party marketing and advertising partners. We use cookies for social media, analytics and advertising purposes. For more information, see our Privacy Policy. **Privacy Policy**

**Manage Preferences**          **Ok – Necessary Only**

**Accept Cookies**

2



*Figure 1 – Cookie Banner and Cookie Settings of Honey Baked, representing that users could change tracking behavior through Cookie Settings*

3.     Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website,

3

before they can interact with the Cookie Banner or select their preferences in the Cookie Settings.

4.      Users were misled by Defendant's Cookie Banner and Cookie Settings, which led users to believe that their data would only be shared through continued use and interaction with the Website and with user consent.

5.      The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

6.      The Website offers users the ability to disable non-essential cookies and disable the sale or disclosure of personal data by: (1) clicking the "Necessary Cookies Only" button in the Cookie Banner; (2) toggling off " all cookies that were not strictly necessary" in the Cookie Settings; and (3) clicking the "Reject" button

4

in the Cookie Settings. Each of these actions has the same effect: to limit the Website's use of cookies only to those necessary to function and to otherwise disable cookies that would record or share their Sensitive Information.

7.     However, even after users affirmatively reject all but "strictly necessary" cookies, regardless of which mechanism is used to achieve that goal, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools. These companies include Google, LLC ("Google") and the Microsoft Corporation ("Microsoft") (collectively referred to herein as the "Tracking Entities").

8.     Honey Baked's Cookie Banner and Cookie Settings are deceptive because (1) the Website places Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website, before users have the ability to interact with the Cookie Banner, and (2) the Website continues to use Tracking Tools that intercept and transmit users' Sensitive Information to Tracking Entities after users reject all non-essential cookies. Honey Baked's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit users' data constitute an invasion of privacy, an intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism and a user's ability to opt out of the sale/sharing of their

5

Sensitive Information effectively deprives users of control over their Sensitive Information and their privacy.

9. In short, via the Website's Cookie Banner and Cookie Settings, Defendant materially misleads users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

10. Plaintiffs' experience reflects the conduct described above. Plaintiffs, residents of California and Florida, respectively, visited Defendant's Website in or around 2025 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Website's content.

11. While accessing the Website from their respective home states, Plaintiffs encountered the Website's Cookie Banner and Cookie Settings. Plaintiffs affirmatively rejected all but "[s]trictly [n]ecessary [c]ookies," relying on Defendant's representations that marketing and Tracking Tools would be disabled upon rejection. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted and recorded Plaintiffs' Sensitive Information and transmitted Plaintiffs' Sensitive Information to the Tracking Entities.

12. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their Sensitive Information was nonetheless collected and shared without their valid consent. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could make.

Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping) and 638.51 (unlawful use of a pen register or trap and trace device); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., Florida's Security of Communications Act "FSCA"), Fla. Stat. § 934.01, et seq., and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

14.    This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

15.    Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

16.    Plaintiff Cristi Colley is, and at all relevant times has been, a citizen and resident of the State of Florida. Plaintiff Colley accessed and used Defendant's Website while physically located in Florida. Most recently, Plaintiff Colley visited

8

the Website in or about October 2025 for consumer browsing purposes. Plaintiff Colley does not maintain an account with Defendant and has not made a purchase through the Website. Plaintiff consistently declines non-essential cookies on all websites she visits as a matter of personal-privacy practice. In connection with her visit to Defendant's Website, Plaintiff Colley engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Colley relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Colley reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Colley's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Colley's communications with the Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Colley's clear refusal of non-essential tracking technologies. As a result, Plaintiff Colley's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Colley known that she could not rely on Defendant's misrepresentations regarding cookie

9

controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Website.

17.     Plaintiff Nina Harris is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Harris accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Harris visited the Website in or about October 2025 for consumer browsing purposes, specifically to find a location of the store. Plaintiff Harris does not maintain an account with Defendant and has not made a purchase through the Website. Plaintiff consistently declines non-essential cookies on all websites she visits as a matter of personal-privacy practice. In connection with her visit to Defendant's Website, Plaintiff Harris engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Harris relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Harris reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Harris's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Harris's communications with the

10

Website, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Harris's clear refusal of non-essential tracking technologies. As a result, Plaintiff Harris's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Harris known that she could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Website.

18.    Defendant Honey Baked Ham Company, LLC is a for-profit corporation organized under the laws of the State of Delaware, registered to conduct business within the State of California, with its principal place of business in Alpharetta, Georgia. Honey Baked sells a variety of food products, including hams, turkey, side dishes, desserts, and related merchandise through its Website located at https://www.honeybaked.com/.

## FACTUAL ALLEGATIONS

### I.    How Websites Function

19.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

20.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

21.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

22.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

23.    An IP address is "a unique address that identifies a device on the Internet or a local network."[4] In essence, an IP address is defined as follows:

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).

[2] *Id.*

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[5]

24.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

25.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

26.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:

---

[5] *Id.*

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).



*Figure 2 - Mozilla's diagram of a URL, including parameters*[8]

27.    Website owners or web developers write and manage the URLs for their websites.

28.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

29.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

30.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:

---

[8] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).
[9] *Id.*
[10] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).
[11] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).
[12] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).

14



*Figure 3 – Demonstrating URL encoding and decoding[13]*

31.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 4 – Sample webpage used to demonstrate a webpage URL*

---

[13] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 5)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

32.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into

the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

33.     To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

34.     Such complex tasks include streaming videos by users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report users' activity.

35.     In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

17

everything a user does (or does not do) on a website and when and how they do it and with what software and hardware.

36.    Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

## II.    Defendant Programmed the Website To Include Third-Party Resources that Utilize Cookies and Tracking Tools

37.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

38.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

39.    First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

40.    Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

41.    As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

42.    Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and

targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

43.    Defendant owns and operates the Website, which allows users to browse and purchase a variety of food products, including hams, turkey, sides, desserts, and gift packages; locate and interact with nearby Honey Baked retail locations; access catering services and product information; create and manage user accounts; and explore seasonal promotions and special offers. When users interact with the Website by navigating pages, clicking links, entering data, or ordering Honey Baked's products, they communicate directly to Defendant.

44.    Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted those cookies to Tracking Entities, combined with parameters, metadata, and detailed Request URLs. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these

20

Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

45.    Defendant's explanation as to its use of Tracking Tools on the Website is contained in the Cookie Settings:

> We use cookies to provide you with our website and services, monitor site usage and analyze web traffic, provide enhanced functionality and services, and personalize our marketing and advertising content based on your interests. We use our own and third-party cookies for social media, analytics and advertising purposes. For more information, see our Privacy policy [sic].[17]

46.    The Cookie Settings state that users can reject non-essential cookies, including performance, functional, and targeting cookies

47.    The Cookie Settings further represent that "Performance Cookies" are used across the Website to count site visits and traffic sources:

**Performance Cookies**

> These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

---

[17] *See Figures 1* and *7*, which depict Defendant's Cookie Banner and Cookie Settings.

48.    The Cookie Settings further represent that "Functional Cookies" are used across the Website to provide enhanced functionality and personalization for users' interests:

**Functional Cookies**

These cookies enable the website to provide enhanced functionality and personalisation. They may be set by us or by third-party providers whose services we have added to our pages. If you do not allow these cookies then some or all of these services may not function properly.

49.    The Cookie Settings further represent that "Targeting Cookies" are used across the Website by advertising partners to build profiles of users' interests and show them relevant adverts on other sites:

**Targeting Cookies**

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

50.    Defendant's notices clearly inform users that their detailed browsing activity and interactions with the Website would ***not*** be captured and transmitted to the Tracking Entities via the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when users affirmatively rejected all but strictly necessary cookies.

22

**III.    The Website's Cookie Banner Misled Users**

51.    When users in locations such as California and/or Florida visited the Website, the Website immediately displayed the Cookie Banner and informed users of the Website that "[b]y using our website, you consent to us sharing your information with third party marketing and advertising partners. We use cookies for social media, analytics, and advertising purposes. For more information, see our Privacy Policy."[18]

52.    The Cookie Banner presented users with buttons labeled "Ok – Necessary Only", "Accept Cookies," and "Manage Preferences," as well as a hyperlink to Defendant's Privacy Policy. After clicking any buttons on the Cookie Banner, it disappears.

By using our website, you consent to us sharing your information with third party marketing and advertising partners. We use cookies for social media, analytics and advertising purposes. For more information, see our Privacy Policy. **Privacy Policy**

**Manage Preferences**            **Ok – Necessary Only**

**Accept Cookies**

---

[18] *See Figures 1* and *7*, which depict Defendant's Cookie Banner and Cookie Settings.



*Figure 7 –Honey Baked's Cookie Settings, representing that users can manage the use of cookies, the sharing, or the sale of personal data*

53.    Website users who selected the "Manage Preferences" option were presented with the Cookie Settings, which represented that users could control how

24

their Sensitive Information was collected and shared by accepting only necessary cookies.

54. After users declined all non-essential cookies other than those strictly necessary, users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

55. Defendant's Cookie Banner and Cookie Settings representations led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had successfully disabled all but strictly necessary cookies via their express rejection. The Cookie Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to prevent the use of any Tracking Tools other than strictly necessary cookies.

56. These representations were false. Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users chose to decline all cookies other than those strictly necessary, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools other than those strictly necessary for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies,

25

to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

57.    The wording of Defendant's Cookie Banner misleads all users on the Website. The Cookie Banner claims that "By using our website, you consent to us sharing your information with third-party marketing and advertising partners." This wording represents to users that using the Website causes users to accept the use of cookies and other tracking technologies. However, the Cookie Banner shows users the options to accept all cookies or only necessary cookies, representing to users that they only accept cookies by clicking the "Accept All" button. This contradictory language confuses users as to the consent mechanism operating on the Website and materially misleads all users on the Website.

58.    The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their (and Defendant's) monetary gain.

**IV.    Defendant's Website Uses Tracking Tools To Spy on Users**

59.    Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

60.    Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

61.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[19]

62.    URL parameters include key-value pairs formatted as "key=value."

    a.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[19] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

b.      The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 10 - Diagram of a URL displaying how parameters function*[20]

## A.    The Meta Pixel

63.    Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring users interactions on their websites, which can then be shared with Facebook.

64.    The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or

[20] *Id.*

link a related Facebook account to its Pixel, then add code to the website to use the Meta Pixel.[21]

65.    Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[22] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[23]

66.    This Pixel ID must match "a known Pixel ID" in Meta's system,[24] and is transmitted by the Meta Pixel.[25]

67.    As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[26]

---

[21] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=12053766828321 42 (last visited Feb. 17, 2026).

[22] *Id.*

[23] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 17, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[24] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 17, 2026).

[25] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).

[26] *Get Started*, FACEBOOK, (last visited Feb. 17, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

68.     Defendant employs the Meta Pixel to gather, collect, and then share users' information with Facebook.[27] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[28]

69.     The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[29]

70.     Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

71.     When a Facebook user logs onto Facebook, tracking cookies, including the "c_user's cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the user's device.[30] These cookies allow

---

[27] The Facebook Pixel allows websites to track visitor activity by monitoring users' actions ("events") that websites want tracked and share the tracked users' data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).

[28] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026).

[29] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 17, 2026).

[30] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Feb. 17, 2026).

Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

72.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 18 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

73.    The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 18* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the UID, as depicted below:



*Figure 19 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

74.    The Meta Pixel tracks users' activity on web pages by monitoring events,[31] which, when triggered, cause the Pixel to automatically send data—users' Sensitive Information—directly to Facebook.[32] Examples of events utilized by websites include (i) a user loading a page with a Pixel installed (the "PageView

---

[31] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 17, 2026).

[32] *Id.*

32

event")[33];   (ii)   when   pre-designated   buttons   are   clicked   (the "SubscribedButtonClick" event).[34] The Website utilizes these two "Pixel Events".[35]

75.     Defendant also uses the Meta Pixel to transmit its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel IDs of "1341265822620931".

76.     Defendant uses the Meta Pixel to monetize their Website users' Sensitive Information.

77.     Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook uses consumers' Sensitive Information to refine its marketing algorithms, profiting from the ability to more accurately target potential customers.

78.     Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 16.*

---

[33] *Meta: Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=12053766828321 42 (last visited Oct. 1, 2025).
[34] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=12053766828321 42 (last visited Feb. 17, 2026).
[35] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=12053766828321 42 (last visited Feb. 17, 2026).



*Figure 20 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "PageView" event*





*Figure 21 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "SubscribedButtonClick" event*

79.     When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[36] But Plaintiffs and Website users are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Facebook.

80.     To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

---

[36] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Feb. 17, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook users' accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

81.    The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[37]

82.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against users IDs, as well as to combine those users IDs with corresponding [Pixel Event information]."[38]

83.    Facebook directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[39] *before* data can be shared.[40]

84.    Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

85.    Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website

---

[37] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNy hZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).
[38] *Id.*
[39] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes Users' information visible. *See id.*
[40] *Id.*

owners to obtain the requisite rights, permissions, or consents, before sharing information with any third party.[41]

86.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

## B.     Google Analytics

87.     Google's Tracking Tools are not implemented into websites by Google and require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

88.     Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

89.     Google Analytics ("GA") invisibly collects data about users interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

---

[41] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=81885903231796 5 (last visited Feb. 17, 2026).

90.   The data collected through GA is sent back to Google, which associates the activity with the website it was collected from. Notably, Google notifies web developers that they should provide "Users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[42]

91.   In short, the use of GA involves specific data collection practices, pre-configured settings, and known transmission paths for users' data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

92.   Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating their Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding the GA tag to their website.

93.   Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiffs' communications with the Website to Google, as depicted from the example taken directly from the Website below:

---

[42] *About the Google Tag,* GOOGLE, https://policies.google.com/technologies/cookies (last visited Apr. 6, 2026).







*Figure 11 –Google Analytics intercepting communications with the Website and redirecting them to Google*

94.      The GA parameters and payload contain a "cid" value. This value is functionally identical to the "_ga" first-party cookie set by the Website.

95.      By way of example depicted in the figures above, for the sample Website user, the "_ga" cookie placed by the Website is "GA1.1.94991337.1773783091," while the "cid" value is "949912337.1773783091." The "cid" value removes the "ga1.1" prefix from the "_ga" cookie, but is otherwise identical.

96.    The "_ga" cookie identifies specific users to Google, allowing Google to intercept the contents of users' communications on the Website and associate them with a specific profile.[43]

97.    After receiving users' Sensitive Information, Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

98.    On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[44]

99.    "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and users," explained Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[45]

---

[43] *How Google Uses Cookies,* GOOGLE https://policies.google.com/technologies/cookies (last visited Feb. 26, 2026)
[44] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Feb. 10, 2026).
[45] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

100.   Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[46]

101.   In addition to device identifiers, fingerprinting ingests all of the websites and apps that the user uses, creating a detailed map for Google to follow and analyze, allowing a profile to be built of everything the Subscriber likes and is likely to buy.[47]

102.   Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts users choice and is wrong."[48]

103.   In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[49]

---

[46] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), (last visited Feb. 10, 2026).

[47] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Feb. 10, 2026); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Feb. 10, 2026).

[48] *Id.*

[49] *Id.*

104.   The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[50]

105.   The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[51]

106.   Because fingerprinting does not rely exclusively on cookies or other traditional storage mechanisms, users are unable to entirely control Google's tracking, even when they actively manage their browser privacy settings. Defendant's procurement of Google to intercept and use data to digitally fingerprint users, including Plaintiffs, thus allows for the persistent monitoring of users' identities and online activity across devices, sessions, and websites across the internet, all without users' knowledge or consent.

---

[50] *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).
[51] *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024), (last visited Feb. 10, 2026).

107. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency in which the purchase was made.[52]

108. As a result of Defendant's implementation of Google Analytics, Plaintiffs' and the Class Members' Sensitive Information was intercepted and used by Google without their knowledge or consent.

**C.    Microsoft UET**

109. Microsoft offers Microsoft Advertising (formerly known as "Bing Advertising"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[53]

110. One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences, and automate advertisement bidding.[54]

---

[52] *Id.*

[53] *Bing Ads API Overview,* MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Feb. 25, 2026).

[54] *What is UET and how can it help me?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Feb. 25, 2026).

111.    UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[55]

112.    UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a global unique ID assigned to a visitor's browser that identifies them,[56] the _uetsid cookie, which contains a session ID, and the _uetvid, which contains a unique ID for a unique website visitor.[57]

113.    UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every http request from UET. UET can also collect:

- Event actions

- Event categories

- Event types

- Browser language setting

- Page URLs

---

[55] *What is UET and how does it related to conversion tracking and remarketing features?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

[56] *Guid Struct,* MICROSOFT, https://learn.microsoft.com/en-us/dotnet/api/system.guid?view=net-10.0 (last visited Mar. 3, 2026).

[57] *What cookies does UET use?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

- Referrer URLs

- Screen height

- Session ID

- The UET tag ID

- A signed-in users' ID

- A visitor ID[58]

114.   Defendant's use of UET on the Website can be seen in the figures below.



---

[58] *What data does UET collect once I install it on my Website?,* MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).





*Figure 23 – UET tracking users' communications on the Website*

115.    Microsoft informs websites using UET that they are responsible for managing visitor consent. Websites are instructed to place the "_uetmsdns" cookie as a first-party cookie and set the value to 1 to stop events from firing and respect visitor consent choices, should they not accept the use of trackers.[59]

---

[59] *How can I stop UET events from being fired for users who request to restrict data sharing?,* MICROSOFT*,* https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Feb. 25, 2026).

116.   Defendant failed to place this cookie on the Website, and did not stop UET events from firing when visitors declined the use of cookies

## V.    Defendant's Conduct Violated the Federal Wiretap Act, CIPA, and the FSCA

117.   Courts analyze claims under Cal. Penal Code § 631 under the same framework applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020)

118.   Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

119.   Similarly, the federal Wiretap Act prohibits the intentional interception[60] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

---

[60] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

120.   Like CIPA, the FSCA is modeled after and in substance tracks the federal Wiretap Act. *See O'Brien v. O'Brien*, 899 So. 2d 1133, 1135-36 (Fla. Dist. Ct. App. 2005). The FSCA establishes a comprehensive prohibition on intentional interception, making it unlawful for any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. This prohibition extends beyond direct interception to encompass attempts and procurement of others to engage in such conduct. *See* Fla. Stat. § 934.03.

A.     **Defendant Intercepted the Contents of Communications in Transit**

121.   Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

122.   Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Website, identifying information in the form of cookies, and users' activity information indicating users' commercial activity and purchases.

123.   The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the

49

Tools loaded onto Plaintiffs' browsers, and additionally transmit data at the moment Plaintiffs submitted information through the Website.

124. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

125. The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

126. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA at Cal. Penal Code § 631, the federal Wiretap Act at 18 U.S.C. § 2511(1)(a), and the FSCA at Fla. Stat. § 934.03.

**B.    Defendant Aided and Abetted Third-Party Interceptions**

127. A party violates Cal. Penal Code § 631, 18 U.S.C. § 2511(1)(a), and Fla. Stat. § 934.03 not only by directly intercepting communications, but also by knowingly permitting, procuring, or facilitating third-party interception. *See Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) ("[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap.");

*Acceptance Ins. Co. v. Bates, Dunning & Assocs., Inc.*, 858 So. 2d 1068, 1069 (Fla. Dist. Ct. App. 2003) (explaining that "procure[ment]" under Fla. Stat. § 934.03 includes "causing others to intercept").

128.  Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

129.  CIPA at Cal. Penal Code § 631(a) and the FSCA at Fla. Stat. § 934.03(2)(d) require the prior consent of all parties to the communication.

130.  The federal Wiretap Act at 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

131.  Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid prior consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

**C.    The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

132.  California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating

51

number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

133. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

134. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

135. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

52

136. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

137. The CIPA at California Pen. Code § 637.2 imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

138. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

### D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway

139. When users visit Defendant's Website, they are presented with a Cookie Banner and Cookie Settings that state that users can reject all but cookies that are strictly essential for Website functionality, including those from the Tracking Entities.

140. The Cookie Settings provides toggles and controls that allow users to decline Tracking Tools that are not necessary for the Website to function.

141. Users who reject non-essential cookies reasonably believe that non-essential tracking will stop. The Cookie Settings communicate that users can

prevent their browsing activity from being shared with Tracking Entities through the use of cookies.

142.    That representation is false.

143.    Even after users rejected non-essential cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Website and transmitted those communications and identifiers to third-party tracking companies.

144.    Users were told they could disable tracking, attempted to disable it, and the Defendant continued tracking them anyway.

**E.    Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Settings**

145.    Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Accept Cookies" or "Ok – Necessary Only" on the Cookie Banner.

146.    As a result, users were tracked from the moment they began using the Website, without prior consent.

147.    Plaintiffs visited the Website while those default tracking settings were active.

148.    Users who visit the Website are shown a Cookie Banner offering the option to accept only "necessary" cookies.



*Figure 21 – The Cookie Banner shown to users who visit the Website*

149. Despite those representations, even users who declined all non-essential cookies continued to be tracked by at least GA and the Microsoft UET.



*Figure 22- The GA Pixel tracking a user who declined all unnecessary cookies*



*Figure 23- The UET tracking a user who declined all unnecessary cookies*

150.    Defendant intentionally placed GA and Microsoft, tracking cookies on the Website and allowed Google and Microsoft to track users and intercept their communications with the Website, despite stating in the Cookie Settings that

tracking cookies would not be placed if users rejected the use of non-essential cookies.

151.   Defendant placed, and allowed to be placed, the "_ga" cookie from Google and the "MUID" cookie from Microsoft. These cookies identify users and allow the Tracking Entities to track users, intercept their communications, and build personal profiles based on that tracking.

152.   Defendant represented to all users that the "Targeting Cookies" would not contain directly personal information that identified users. This representation was false. The moment users arrived on the Website Defendant placed, and allowed to be placed, the c_user cookie from Facebook. This cookie, as previously discussed, directly identified users on the Website through their Facebook profile.

153.   This representation misled all users who chose to accept all cookies on the Website. Users accepted cookies, believing that the cookies would not personally identify them based on Defendant's representation. Despite this representation, Defendant placed, and allowed to be placed, cookies that personally identified users.

154.   Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

155.   Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[61]

156.   The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[62]

## CLASS ALLEGATIONS

157.   Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclasses (collectively "the Class").

158.   Plaintiffs bring this class action individually and on behalf of the following Class:

---

[61] *[GA4] User Explorer* GOOGLE, https://support.google.com/analytics/answer/9283607?sjid=148866656133865720 22-NA#zippy=%2Cin-this-article (last visited Mar. 24, 2026) ; *Universal Event Tracking*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13#audience (last visited Mar. 24, 2026).

[62] *See Data sharing settings*, GOOGLE (July 29, 2024) https://support.google.com/analytics/answer/1011397?hl=en&ref_topic=2919631& sjid=14886665613386572022-NA (last visited Mar. 24, 2026).; *Microsoft Advertising Agreement*, MICROSOFT https://help.ads-int.microsoft.com/resources/Microsoft_Advertising_Agreement_08042025_Online _Terms/en.pdf (last visited Mar. 24, 2026).

All natural persons who visited Defendant's Website in the United States during the applicable limitations period, who interacted with the Website's Cookie Settings and rejected all non-essential cookies, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Nationwide Class").

159.    Plaintiff Harris brings this class action individually and on behalf of the following California Subclass:

All members of the Nationwide Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of California (the "California Subclass").

160.    Plaintiff Colley brings this class action individually and on behalf of the following Florida Subclass:

All members of the Nationwide Class who visited and interacted with the Defendant's Website during the applicable limitations period while located in the State of Florida while located in the State of Florida (the "Florida Subclass").

161.    Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

162.    Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be

expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

163. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

164. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant shared the Class Members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class Members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

    c.     Whether Defendant's conduct constitutes a violation of the Wiretap Act;

    d.     Whether the Class Members are entitled to actual damages, punitive damages, and/or statutory penalties; and

    e.     Whether the Class Members are entitled to injunctive relief.

165. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class Members.

166. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class Members or whose inclusion would otherwise be improper are excluded.

167. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF THE WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

168.    Plaintiffs incorporate the allegations in paragraphs 1–167 by reference as if fully set forth herein.

169.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

170.    The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

171.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

172.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

173.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

174.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature

transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

175. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

176. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

177. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

178. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, browsing activity, shopping-related interactions, and other interactions with Website features, particularly where Defendant represented through its Cookie Banner, Cookie Settings, and Privacy Policy that users could decline non-essential cookies.

179. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order

63

interactions, are sensitive and convey the substance and meaning of the communication.

180. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

181. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

182. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet and used for advertising, analytics, and marketing optimization.

183. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Website through their browsers.

184. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

185. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential cookies and declined third-party tracking through Defendant's cookie-preference interface

186. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

187. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed them to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner, and were an invasion of privacy.

188.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

    a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

    b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

    c.    reasonable attorneys' fees and costs.

## COUNT II
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Nationwide Class)

189.    Plaintiffs incorporate the allegations in paragraphs 1–167 by reference as if fully set forth herein.

190.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

191.    Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Nationwide Class by, among other things, permitting Tracking Tools to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

66

192.    Plaintiffs and the Nationwide Class Members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[63] Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.

193.    Plaintiffs and the Nationwide Class Members relied on Defendant's representations and exercised the Website's opt-out controls, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner and Cookie Settings that users could opt out of the sale/sharing of personal information and decline non-essential cookies.

194.    Despite Plaintiffs' and the Nationwide Class Members' opt-outs, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed

---

[63] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

users' profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

195.    Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

196.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class Members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

197.    Plaintiffs and the Nationwide Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

<u>COUNT III</u>
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiff Harris and the California Subclass)**

198.    Plaintiff Harris incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

199.    Plaintiff Harris brings this cause of action on behalf of herself and all California Subclass Members.

200.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

201.   California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

202.   In support of Proposition 11, voters stated that:

The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

203.   Plaintiff Harris and the California Subclass Members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiff Harris and California Subclass Members' protected interests arise from various statutes and common law, including, inter alia, the

69

Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

204. The privacy rights of Plaintiff Harris and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Harris and the California Subclass Members.

205. Plaintiff Harris and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information.

206. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' opt-outs, Defendant violated their reasonable expectation of privacy.

207. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

208. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff Harris and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

70

**COUNT IV**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff Harris and the California Subclass)**

209.   Plaintiff Harris incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

210.   Plaintiff Harris brings this cause of action on behalf of herself and all California Subclass Members.

211.   CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

212.   CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts

to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

213. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

214. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

215. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).

216. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass Members, contemporaneous with the

72

communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate Cal. Penal Code § 631.

217.   Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

218.   Plaintiff Harris and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiff Harris and the California Subclass Members' respective rights to privacy.

## COUNT V
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiff Harris and the California Subclass)

219.   Plaintiff Harris incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

220.   Plaintiff Harris brings this cause of action on behalf of herself and all California Subclass Members.

221. California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code §§ 630.50-638.55

222. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

223. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

224. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

225. Cal. Penal Code § 638.51(a) provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ."

226. No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture

74

phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

227. Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Harris and the California Subclass Members' activity on the Website.

228. Defendant did not obtain consent from Plaintiff Harris or the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has violated Section 638.51.

229. As a direct and proximate result of Defendant's conduct, Plaintiff Harris and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA CONSUMER**
**LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1770, et seq.**
**(On Behalf of Plaintiff Harris and the California Subclass)**

230. Plaintiff Harris incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

231. Plaintiff Harris brings this cause of action on behalf of herself and all California Subclass Members.

232. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

233. Defendant is a person within the meaning of the CLRA.

234. Plaintiff Harris is a consumer of Defendant's services under the CLRA, as Plaintiff Harris used Defendant's Website to browse products.

235. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated Cal. Civ. Code § 1770(a)(2) by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

236. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

237. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

238. Defendant's failure to disclose was material to Website users, such as Plaintiff Harris. Users could have chosen a different website that did not use Tracking Tools, chosen a website that disclosed the presence of Tracking Tools and

allowed them to be disabled, and/or chosen a website that requested consent before implementing Tracking Tools.

239.    Plaintiff Harris and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## COUNT VII
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
Cal. Bus. & Prof. Code § 17200, et seq.
**(On Behalf of Plaintiff Harris and the California Subclass)**

240.    Plaintiff Harris incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

241.    Plaintiff Harris brings this cause of action on behalf of herself and all California Subclass Members.

242.    The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code § 17200.

243.    By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website, Defendant has violated the unlawful prong of the UCL.

244.    Defendant has violated the unlawful prong of the UCL by way of Defendant's above-described violations of the Wiretap Act, CIPA, and the FSCA arising from Defendant's purposeful installation and utilization of the Tracking Tools on the Website.

245.    By actively and fraudulently deceiving users about their ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

246.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed Plaintiff Harris's and the California Subclass Members' Sensitive Information without their knowledge or consent. Defendant disclosed Plaintiff Harris's and the California Subclass Members' information to the Tracking Entities to build personal profiles without their knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about their ability to disable the Tracking Tools. Through this conduct, Defendant violated the unfair prong of the UCL.

247.    Plaintiff Harris has standing to bring claims against Defendant under the UCL. Plaintiff Harris's information was tracked and recorded without consent. Plaintiff Harris's data was used to build personal profiles for advertising purposes without consent.

248.    Plaintiff Harris would have considered it important to the decision to visit Defendant's Website to know that her data was being tracked and recorded without her consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

78

249.    Instead, Plaintiff Harris exercised the Website's privacy controls and continued using the Website in reliance on Defendant's representations that non-essential tracking had been disabled and that Plaintiff Harris's information would not be shared with Tracking Entities.

250.    Because of Defendant's UCL violations described above, Plaintiff Harris suffered injury by losing control of her personal data and having her Sensitive Information tracked and recorded without her consent.

251.    Plaintiff Harris and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

### COUNT VIII
### VIOLATIONS OF FLORIDA SECURITY OF COMMUNICATIONS ACT
### Fla. Stat. § 934.01, et seq.
### (On Behalf of Plaintiff Colley and the Florida Subclass)

252.    Plaintiff Colley incorporates the allegations in paragraphs 1–167 by reference as if fully set forth herein.

253.    Plaintiff Colley brings this cause of action on behalf of herself and all Florida Subclass members.

254.    The FSCA begins with legislative findings, stating that "[o]n the basis of its own investigations and of published studies, the Legislature makes the following findings...(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when

79

authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court." Fla. Stat. § 934.01(4).

255. Fla. Stat. § 934.10(1) provides that

[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity that engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

256. The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

257. The FSCA determines the location of the interception of a communication based on ". . . where the communication originates [from]." *State v. Mozo*, 655 So. 2d 1115, 1117 (Fla. 1995).

258. Fla. Stat. § 934.03(1)(a) prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept any wire, oral, or electronic communication, except as otherwise specifically provided by statute.

259. Fla. Stat. § 934.03(1)(c) further prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through an unlawful interception.

260. Fla. Stat. § 934.03(1)(d) further prohibits any person from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through an unlawful interception.

261. Defendant's conduct constitutes violations of Fla. Stat. § 934.03(1), where the Website facilitated the Tracking Tools' interception, disclosure, and use of Plaintiff Colley's and the Florida Subclass Members' electronic communications without their consent.

262. Fla. Stat. § 934.03(2)(d) provides that interception is unlawful where all parties to the communication have not given prior consent to such interception.[64]

---

[64] With respect to the FSCA's requirement for prior consent of all parties to the intercepted communication, Fla. Stat. § 934.03(2) contains exceptions related to ministerial operations of employees of communications service providers, criminal

263.    The FSCA applies to the interception of the "contents" of an electronic communication, meaning information concerning the substance, purport, or meaning of that communication. Information that reflects a user's searches, inputs, or selections conveys the substance and meaning of the user's communication with the website.

264.    The intercepted electronic communications at issue here included the substance, import, and meaning of Plaintiff Colley's and the Florida Subclass Members' communications with Defendant's Website, including, without limitation, the URLs visited, menu items viewed, searches performed, selections made, form inputs, order-related interactions, and associated device and session identifiers. This information reflects users' choices, intent, and behavior and constitutes the contents of electronic communications under the FSCA. This information conveyed the substance and meaning of Plaintiff Colley's and the Florida Subclass Members' communications with Defendant's Website.

265.    Communications sent by Defendant's Website to users, including Plaintiff Colley and the Florida Subclass Members, automatically caused users' browsers to send users' Sensitive Information to the Tracking Entities.

---

investigations by law enforcement, and/or employees of fire stations, public utilities, and ambulance services. None of the aforementioned enumerated exceptions are relevant to Plaintiff Colley's claims here.

82

266. At all relevant times, Defendant procured the service of, aided, employed, agreed with, and conspired with the Tracking Entities to intercept Plaintiff Colley's and the Florida Subclass Members' electronic communications while they accessed and interacted with Defendant's Website.

267. Plaintiff Colley and the Florida Subclass Members had a reasonable expectation of privacy in their electronic communications with Defendant's Website, where Defendant represented through its Cookie Banner, Cookie Settings, and Privacy Policy that users could opt out of the sale/sharing of their personal information and decline non-essential Tracking Tools.

268. Notwithstanding those representations and users' affirmative opt-outs, Defendant intentionally caused the Tracking Tools to be embedded and executed on the Website in a manner that recorded and transmitted the contents of Plaintiff Colley's and the Florida Subclass Members' electronic communications to the Tracking Entities contemporaneously with the communications and without users' knowledge or consent. The transmissions occurred contemporaneously with the communications.

269. Defendant willingly facilitated the interception and collection of Plaintiff Colley's and the Florida Subclass Members' communications by embedding and enabling the Tracking Tools on their Website and configuring those tools to transmit data to third-party servers in real time.

270. Defendant used the following items as devices or apparatuses to intercept wire, electronic, or oral communications made by Plaintiff Colley and the Florida Subclass Members:

    a.    The Website's source code, which contained Tracking Tools that recorded and disseminated the contents of users' communications as they interacted with the Website;

    b.    Plaintiff Colley's and the Florida Subclass Members' web browsers, which were caused by the Website's code to transmit communications to Tracking Entities;

    c.    Plaintiff Colley's and the Florida Subclass Members' computing and mobile devices;

    d.    Third-Party Web and advertising servers, which received and processed intercepted communications for the Tracking Entities; and

    e.    Server-to-server communications between Defendant and the Tracking Entities that enabled the dissemination of users' communications independent of user-initiated disclosures.

271. Defendant failed to adequately disclose the nature, scope, and real-time operation of the Tracking Tools that automatically transmitted the contents of

Plaintiff Colley's and the Florida Subclass Members' communications to third parties for advertising, analytics, and marketing purposes.

272. Liability under the FSCA requires consent of all parties to the communication. Defendant did not obtain Plaintiff Colley's and the Florida Subclass Members' prior, knowing, and voluntary consent to the interception, disclosure, or use of their electronic communications.

273. By aiding and permitting the Tracking Entities to receive Plaintiff Colley's and the Florida Subclass Members' online communications in real time through the Website without consent or judicial authorization, Defendant violated the FSCA.

274. Defendant's interception and disclosure of Plaintiff Colley's and the Florida Subclass Members' electronic communications violated their statutorily protected privacy rights under Florida law.

275. As a result of Defendant's violations of the FSCA, and pursuant to Fla. Stat. § 934.10, Plaintiff Colley and the Florida Subclass Members are entitled to actual damages or, in the alternative, liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater.

276. Plaintiff Colley and the Florida Subclass Members are further entitled to injunctive and declaratory relief, punitive damages in an amount sufficient to

deter similar misconduct, and reasonable attorneys' fees and litigation costs as provided by Fla. Stat. § 934.10.

## COUNT IX
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
### (On Behalf of Plaintiffs and the Nationwide Class)

277. Plaintiffs incorporate the allegations in paragraphs 1–167 by reference as if fully set forth herein.

278. Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

279. Defendant made affirmative representations to users through its Cookie Banner, Cookie Settings, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

280. Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

281. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

282. These representations were false and misleading. Before users, including Plaintiffs and the Nationwide Class Members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-essential cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Nationwide Class Members' Sensitive Information and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Settings that it would not track users until they consented to the Tracking Tools.

283. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

284. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

285. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully

87

control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

286. Plaintiffs and the Nationwide Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

287. Plaintiffs' and the Nationwide Class Members' reliance was reasonable because Defendant presented the Cookie Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

288. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Nationwide Class Members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

289. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

290.    Plaintiffs and the Nationwide Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT X
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

291.    Plaintiffs incorporate the allegations in paragraphs 1–167 by reference as if fully set forth herein.

292.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class members.

293.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

294.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

295.    Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution

89

or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class Members are entitled to the relief set forth below.

## **PRAYER**

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclasses and their counsel as Class Counsel;

c. For an order declaring the Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs, the Nationwide Class, the California Subclass, and the Florida Subclass on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from

90

the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.   An award of statutory damages or penalties to the extent available;

g.   For damages in amounts to be determined by the Court and/or jury;

h.   For pre-judgment interest on all amounts awarded;

i.   For an order of restitution and all other forms of monetary relief;

j.   An award of all reasonable attorneys' fees and costs; and

k.   Such other and further relief as the Court deems necessary and appropriate.

Dated: April 10, 2026                 **HERMAN JONES LLP**

*/s/ John C. Herman*

John C. Herman (Ga. Bar No. 348370)
Candace N. Smith (Ga. Bar No. 654910)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
csmith@hermanjones.com

Mark S. Reich*
Gary Ishimoto*
Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: mjensen@zlk.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice* forthcoming